Filed 5/21/14  In re K.B. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | B250406 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.B.,<br><br>Defendant and Appellant;<br><br>K.B. et al.,<br><br>Appellants. | (Los Angeles County Super. Ct. No. CK97725) |

APPEAL from the orders of the Superior Court of Los Angeles County.  Amy Pellman, Judge.  Affirmed.

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant L.B.

Kate M. Chandler, under appointment by the Court of Appeal, for Appellants K.B., J.B. and Ja.B.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother L.B. appeals from the dependency court's jurisdictional findings under section 300, subdivisions (a) and (b) of the Welfare and Institutions Code,[1] as well as the dispositional findings and orders under section 361, subdivision (c), for her children, K.B., J.B. and Ja.B. The children also appeal the trial court's jurisdictional finding against mother under subdivision (b), but do not challenge the finding under subdivision (a). Father is not a party to this appeal.

Mother contends the dependency court's conclusion that her children were at risk under section 300, subdivisions (a) and (b), and the court's order removing them from her custody, are not supported by substantial evidence. Mother contends the jurisdictional finding under subdivision (a) is unsupported, as she did not "engage in" domestic violence but instead was a victim of father's abuse. Mother and the children also reason that mother's single drug conviction is insufficient to support jurisdiction under subdivision (b), because any risk of physical harm to the children based on mother's conviction is speculative. Mother also contends that the dispositional order requiring her to undergo drug testing is an abuse of discretion. Neither mother nor the children challenge the jurisdictional findings as to father.

Because we find sufficient evidence to support the jurisdictional findings, and that in any event, the claims made on appeal are nonjusticiable because mother and the children have not challenged the jurisdictional findings as to father, we affirm. Moreover, we need not address mother's challenge to the removal order, as it is moot because the children have since been returned to mother. We also find no abuse of discretion regarding the order requiring mother to drug test.

## BACKGROUND

The family came to the attention of the Department on February 4, 2013, after mother called a domestic violence shelter hotline and reported ongoing domestic violence between her and father. The family included then 16-year-old daughter K.B., 14-year-old son J.B., and 10-year-old son Ja.B. After describing some of the abuse to the hotline

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

employee, and being offered shelter, mother refused to go to the shelter, refused to procure a restraining order, and began recanting her claims of abuse. The children were detained on February 6, 2013.

### 1. The Department's Investigation

Social worker Daniel Okeke summarized his findings in the detention report. On February 4, 2013, Mr. Okeke investigated a referral that the children were in danger because of domestic violence between mother and father. According to the reporting party, mother called a domestic violence shelter hotline, and complained about ongoing domestic violence with father. On February 3, 2013, father and Ja.B. were waiting for mother in the driveway of their home, and father began pounding on mother's windshield, calling mother names, and spitting on her. Mother was scared and called 911, and father left. Mother reported domestic violence occurred "frequently." In other incidents of domestic violence, father wrapped a belt around mother's neck, hit her with belt buckles, and burned her. In 2010, father hid in mother's bedroom wearing a ski mask, and when mother entered the room, he pointed a gun at her and laughed, asking if she was scared. Father owns two guns and has twice threatened mother with guns. She does not know where he keeps his guns.

The children have witnessed domestic violence between mother and father. Ja.B. was present for the February 3 incident. The children also witnessed father destroy all of the walls in the family home. When police responded, mother told them the family was remodeling, and that was why the walls were destroyed. Mother told the hotline employee that father was arrested for domestic violence in 2004, and the Department became involved with the family at that time. Mother had not made other reports concerning the domestic violence in her home, and had not sought a restraining order against father.

Mother and father are separated. Mother and the children live in a home owned by paternal grandparents. Father lives with his girlfriend in Long Beach, but visits the family home and sleeps there whenever he wants. Mother and father continue to have a sexual relationship. Father is "paranoid" and accuses mother of infidelity, even though

3

he lives with his girlfriend. Father placed a tracking device on mother's phone and car. Mother's car is owned by paternal grandfather. Mother believes that father uses drugs.

Mother also told the hotline employee that father keeps pornographic movies in the family home. Mother watched some of the movies, and father was featured in them. She also noticed her 10-year-old son and her sister in the movies. Mother did not explain what her son was doing in the films. When mother confronted father about the videos, he explained that he had software that could change people's faces on the videos. Mother is not positive that her sister and son were in the videos, but believes they were. She did not report this to law enforcement.

Mother told the hotline worker that her children are tired of the situation at home. K.B. told mother to leave father. Mother was accepted into the shelter program but made excuses and told the hotline employee she was not ready to leave yet.

Mr. Okeke and Sheriff's Deputy Cordova went to the family home to investigate the referral on February 4. Deputy Cordova had been to the home about two hours earlier to investigate a suspected child abuse report. Mother, K.B., J.B. and Ja.B. were all fine at that time. Mother told Deputy Cordova that she and father had lots of marital issues. When Deputy Cordova suggested that mother obtain a restraining order, mother denied that father was a threat to her or the children. Mr. Okeke obtained the February 4 incident report from the Sheriff's Department. The report reflects that mother told responding deputies that violence happened years ago and denied that any of her children were involved in any "porn video." When the children were interviewed by the responding deputies, they did not report any abuse.

When Mr. Okeke spoke with mother about the allegations, mother "immediately began recanting and minimizing the domestic violence between her and father." Regarding the February 3 incident, mother told Mr. Okeke that she and father had an argument, and that she called 911 when it began it get heated. However, no assistance was required because father left. When asked about her statements to the domestic violence hotline employee, mother said she never made any reports about pornographic movies. She explained that when the family viewed one of the pornographic movies, it

4

appeared that her 20-year-old son, K.M., was in the movie. However, after closer examination, it was not him. She then denied that the children had watched any pornography. She claimed that father's drug use had occurred years ago, and denied that father threatened her with a gun. Mother explained to Mr. Okeke that she did not go to the domestic violence shelter because she resides in a three bedroom home and does not want to leave it. She did not obtain a restraining order because father was not a threat to her or the children. Mother sought advice from the shelter hotline because she wanted job training, as she had not worked in 20 years. She wanted to start a new life and did not know where to begin.

According to mother, paternal grandparents live across the street from the family home and mother cannot stop father from seeing the children. Mother and father are still married although father lives in Long Beach.

Mother complained to Mr. Okeke that she would not have "told her life story to anyone" if she had known the Department would become involved.

Mr. Okeke interviewed the children, individually and in private. K.B. is in 11th grade. According to K.B., mother and father had argued in the past, and father hit mother "a long time ago." K.B. did not witness the February 3 incident. K.B. is not afraid of father. She denied ever watching any "dirty videos" with anyone in her family.

J.B. is in the eighth grade. He saw father yelling at mother on February 3, but did not see father get physical with mother. He had seen father hit mother in the past, and was sometimes afraid of father, especially when mother and father were arguing. He did not recall watching any "dirty" movies with his parents.

Ja.B. had seen his parents argue in the past, but not recently. He has never watched "dirty" movies with his parents.

Mr. Okeke spoke with father on February 5, over the phone. Father denied getting into an argument with mother on February 3. Mother has never worked, and was "only trying to extract some money from" father. In 2004, father caught mother in bed with another man, and this incident led to his arrest. Father does not own a gun. Father loves the children.

5

Therapist Norma Yoguez evaluated mother, and reported that she suffers from depression caused by her relationship with father. Mother was ambivalent about reporting the domestic violence with father, as she gave conflicting accounts of whether any recent abuse had occurred. Mother was also anxious, sad, had difficulty concentrating and trouble with sleep. Mother described father as "someone who likes having many women and not being loyal to their relationship."

Gabriela Fernandez, with the Women and Children Crisis Center, reported that mother had contacted the center on February 4, seeking shelter for her and her three children. Mother told Fernandez she was ready to leave the family home immediately because of ongoing domestic violence in her 17-year marriage. Mother reported that father watched pornographic movies with the children, and that he monitors mother's movements with a tracking device in her car. Father also keeps two guns in the family home. Mother told Fernandez the children reported the domestic violence to their school in 2004, and the Department became involved with the family. On February 5, 2013 mother called Fernandez and complained about the Department getting involved with her family, and asked whether the children were going to be taken away from her.

Mr. Okeke sought a removal order for the children, which was granted by the court on February 6. That same day, Mr. Okeke, and Sheriff's Deputies Atabaki and Escalona, removed the children from mother and father and placed them with maternal grandparents.

Father was arrested for domestic violence in 2004. He was convicted under Penal Code section 242 and sentenced to two years probation and one day in jail. The family has a history with the Department. On October 4, 2004, the Department received a report that K.B. and J.B. were victims of emotional abuse based on domestic violence between mother and father. Mother told the reporting party that father had beat her really badly, leaving bruises all over her body. The children witnessed the incident. The Department found the allegations of emotional abuse were substantiated as to Ja.B. and J.B. but were inconclusive as to K.B. and K.M. (mother's adult child who is not at issue here). On

6

March 3, 2008, the Department received a referral concerning ongoing domestic violence in the home. This report was deemed unfounded by the Department.

The Department filed a petition on February 11, 2013, alleging ongoing domestic violence between mother and father, and that mother failed to protect the children. At the February 11, 2013 detention hearing, the trial court found a prima facie case to detain the children and ordered monitored visitation for mother and father. Mother and father were also ordered to receive individual and domestic violence counseling. Mother sought a temporary restraining order at the detention hearing, averring in her application that "I was returning from Walmart [and] my husband was in the back yard. He came out of [the] back [yard] [and] was yelling. He said he was going to get me out of the house [and] that the house belongs to him. (My children were all in the house [and] did not witness anything). He kicked my car door [and] punched the window. I called 911 on my cell phone [and] he got in his truck and drove away. I told 911 I no longer needed them to come out [and] they said to call if he was to return."

The Department continued its investigation, and summarized its finding in a March 4 jurisdiction and disposition report, portions of which we describe here. Mother submitted to a Live-Scan on February 21, 2013, which revealed a February 16, 2013 arrest for possession of a controlled substance, in violation of Health and Safety Code section 11377, subdivision (a) and for possessing drug paraphernalia, in violation of section 11364.1, subdivision (a)(1). The Department's court docket request as to father (father had not submitted to a Live-Scan) revealed a 1993 conviction for vandalism, the 2004 battery conviction, and a 1998 arrest for possession of a controlled substance. Court records from his battery conviction identified mother as the victim, and indicated that mother was present at father's arraignment and did "not wish a complete stay away order to be issued."

Department Investigator Mari Makayama interviewed the children. All three children presented as withdrawn and very protective of their mother. K.B. admitted to seeing father push mother. During the interview, K.B. appeared to be under a great deal of stress. J.B. was having problems at school. He was performing below grade level, and

had several suspensions and detentions due to class disruptions, being tardy, failing to follow directions, and aggressive conduct. Ja.B. presented with a flat affect and did not display any facial expressions during the investigator's interview. He simply stared at the investigator, and his only facial movements were when he blinked his eyes. He described father as "sometimes mean."

The Department investigator also obtained a number of police incident reports for the family home. On December 29, 2012, there was a report of mother and father arguing, and items being broken inside the home. There was a February 7, 2013 report of mother and father arguing. Mother was advised to obtain a restraining order but was reluctant to do so.

When the Department investigator interviewed mother, mother denied any domestic violence and immediately blamed the hotline employee for making "misrepresentation[s]." Regarding the February 3 incident, mother admitted that she and father had an argument, but denied he hit her car or spit on her. When asked whether father had wrapped belts around her neck, hit her with belt buckles or burned her, mother said, "It was more than eight years ago. I don't remember exactly what happened. I think he wanted me to leave. He grabbed me. The kids were in a different room. They didn't see it. He was arrested and convicted. He had to do anger management classes." When asked again whether father wrapped a belt around her neck, mother responded, "Yeah, I guess." When asked whether father hit her with belt buckles, mother indicated he had tried to. When asked whether father burned her, mother said father was "messing around" with a lighter and accidentally burned her. When asked about the 2010 gun incident, mother said that father was just playing around, and that he did not have any guns. When confronted with inconsistent statements, mother admitted that some of the facts reported by the domestic violence hotline employee were true. Mother did not know why the reporting party would include untrue allegations.

Mother agreed there was domestic violence in her relationship with father, but claimed he had not touched her since 2004. However, there is a lot of jealousy in their

8

relationship because father is a "serial cheater." She agreed that father has issues controlling his anger.

When asked about her compliance with the case plan, mother said she had made an appointment for individual counseling, but she did not think she needed domestic violence counseling because the domestic violence was in the past, and "I already dealt with it. I want to move on."

According to maternal grandfather, mother only recently admitted to domestic violence between her and father. In December 2012, mother texted maternal grandmother pictures of bruises, and asked maternal grandmother to store the pictures "in case something happened to" her. Mother told maternal grandmother that father came home, "was on dope" and used a belt buckle to beat her. According to maternal grandfather, mother is financially and emotionally dependant on father, and "doesn't want to give up on this guy." In the past, maternal grandparents have asked mother to receive domestic violence counseling, but she denied any violence with father.

The Department investigator concluded that the family was "at very high risk for future abuse."

Sheriff's Deputy Velasco wrote the police report summarizing mother's February 16, 2013 arrest for possession of a controlled substance. He observed mother and a passenger driving with a cracked windshield and noticed that one of the rear brake lights was not working. As he initiated the traffic stop, he noticed the passenger lean forward, as if she was placing something under the seat. When he asked mother if there was anything illegal in the car, she responded, "I have nothing." When he asked the passenger if she placed anything illegal under the seat, she hesitated and responded, "Nothing in the car is mine." When Deputy Velasco searched the car, he found a freshly loaded pipe containing methamphetamine under the passenger seat. He also recovered a freshly loaded pipe containing methamphetamine from the driver's side door panel which was in plain view of mother as she was driving.

When the Department investigator asked mother about her recent arrest, mother said she was driving with a friend when she was pulled over. "[M]y friend gave out a

fake name. I guess they [law enforcement] got suspicious, so they asked me if they can search the car. I told them 'sure.' I didn't have anything to hide. I guess they found a pipe underneath the passenger's seat. I talked to my friend later and she told me it was hers. She got arrested that day because she had warrants." Mother denied any substance abuse history or any current use.

A first amended petition was filed on March 4, 2013, newly alleging that "[on February 16, 2013], mother . . . was arrested for possession of a controlled substance in that two drug paraphernalia pipes containing methamphetamine were found in the mother's car. Said conduct on the part of the children's mother endangers the children's physical and emotional health and safety and placed the children at risk of physical and emotional harm and damage."

### 2. The Adjudication and Disposition Hearing

During the pendency of the adjudication hearing, mother was convicted of possessing a controlled substance. Mother pled guilty to a violation of Health and Safety Code section 11377, subdivision (a) on March 14, 2013. She was placed on deferred entry of judgment for two years and was ordered to complete an "approved controlled substance treatment program."

On March 17, 2013, father was arrested for domestic battery, violating a court order (the restraining order issued in this case), and for possession of a controlled substance.

On February 26, the Department attempted to contact mother to drug test on demand. The Department social worker left a message, but did not hear back that day. The following day, mother spoke with the Department and agreed to test that day, but was a "no show" at the testing facility.

Mother started domestic violence counseling on April 2, 2013. She also tested negative for all substances on March 29, April 9, April 26 and May 6, 2013. However, she was a no show for her May 14, 2013 test, and tested positive for alcohol on May 21,

10

2013.**2** On May 23, 2013, mother informed the Department that she had enrolled in a substance abuse treatment program as required by her criminal case, although she did not provide proof of her enrollment.

A second amended petition was filed on April 16, 2013, which included additional allegations concerning father's arrest for possession of a controlled substance and methamphetamine use.

The contested adjudication and disposition hearing was held on May 28, 2013. The trial court received the Department's reports and their attachments into evidence. The parties stipulated that the children would testify that they had "not seen their mother under the influence of drugs and they feel their mother could protect them and they wish to return to their mother's care." We describe below some of the testimony offered at the hearing.

Mother testified there was "verbal, physical, emotional, [and] financial" domestic violence in her relationship with father. The violence occurred periodically, over an 18-year period. Mother had attended domestic violence counseling three times a week for the past two months. She agreed that she previously minimized the violence in her relationship with father. The classes helped her to realize that the violence in her relationship with father was wrong. Since the pendency of this case, father has only violated the restraining order once, when he broke into the family home and pushed a pillow on mother's face. Mother called police. Mother did not plan to continue her relationship with father. Mother acknowledged that her children suffered because of the domestic violence, and that she was accountable, but said "it's hard to change something like that"; "it has been 18 years." However, mother acknowledged she could have asked for help a long time ago; she could have stopped the abuse "before the kids got so big." Mother pledged to do things differently going forward.

Regarding her arrest, mother testified that she had let friends use her car, and one of her friends left the drugs behind. The drugs were not hers. However, she admitted to

---

**2** There is a discrepancy in the record, making it unclear whether mother was a "no show" on May 1 or May 14.

11

using methamphetamine a "[l]ong time ago." She still "[hung] around with people who use methamphetamine" before her arrest. She has not associated with drug users since she was arrested.

Mother believed she could keep her children safe because she had learned her lesson. According to mother, it was "tremendous" that the Department became involved with her family because it changed her life; she is "completely different" and feels "free again."

Mother asked the court to strike the domestic violence allegations as to her, reasoning that she has acknowledged the domestic violence and obtained a restraining order, and therefore was able to protect the children. Mother sought dismissal of the drug arrest allegation, reasoning that there was no nexus between the arrest and any current risk of harm to the children, and that there was no evidence that mother currently uses drugs.

After considering the evidence, the trial court sustained amended allegations of domestic violence and possession of drug paraphernalia and pipes containing methamphetamine. The trial court did not release the children to mother. The court ordered mother to participate in drug testing, and issued a permanent restraining order.

This timely appeal followed.

After the appeal was filed, the trial court entered an order placing the children in mother's custody.[3]

## DISCUSSION

Mother contends there is insufficient evidence to support the trial court's jurisdictional finding under section 300, subdivisions (a) and (b). Specifically, mother contends there is no substantial evidence she "engaged in" domestic violence with father. Mother does not challenge the jurisdictional findings as to father, and "in no way asserts that the children are not at risk of harm from father due to his violent nature." Mother and the children also contend there was insufficient evidence that her single drug

---

[3] We grant mother's request that we take judicial notice of this order.

conviction placed the children at risk of harm, as there was no nexus between this single incident and any potential harm to the children. The children contend there was no evidence mother was a current drug abuser, and that the petition did not allege she abused drugs.[4] Mother also challenges the trial court's dispositional orders denying her custody of her children and ordering her to drug test. She argues her appeal as to the removal order is not rendered moot by the trial court's subsequent order returning the children to her care.

### 1. Jurisdiction

#### a. Domestic Violence

Under section 300, subdivision (a), the juvenile court may adjudge a child to be a dependent of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Exposure to domestic violence may satisfy subdivision (a), if it creates a substantial risk that the child will suffer "serious physical harm inflicted nonaccidentally by the parent." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-599 [father placed child at substantial risk of serious physical injury by driving with one hand on the steering wheel and using the other to hit and choke mother; struggling with mother over car seat while child was in it; and physically attacking mother while she was holding child].)

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is

---

[4] The children acknowledge that they do not challenge the other jurisdictional findings of the trial court, yet they contend their jurisdictional challenge is justiciable because allowing the drug allegations to stand as to mother could prejudice her in future proceedings. Mother does not address the justiciability of her claims on appeal.

other evidence that would support a contrary finding.  [Citation.]  . . .  [Citation.]  The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

The sustained petition found that the parents' "history of engaging in violent altercations in the presence of the children . . . endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger and failure to protect."  It is undisputed that mother and father have a nearly 20-year history of domestic violence, and that the children witnessed father hitting mother.  It is irrelevant that mother was a victim of father's abuse.  She had an obligation to protect the children and failed to do so by seeking help or leaving father.  As a consequence, the children were exposed to years of violence, putting them at risk of physical harm.

Moreover, mother does not contend there was not substantial evidence to support the jurisdictional findings concerning father.  In fact, mother concedes that father's violent nature put the children at risk.  The jurisdictional findings concerning father's long history of domestic violence render mother's challenge to jurisdiction nonjusticiable.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490-1491.)

### b.  Drug Conviction

Generally, our conclusion that substantial evidence supports jurisdiction under section 300, subdivision (a), would foreclose us from addressing the argument that the evidence does not support a jurisdictional finding under subdivision (b).  (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["[A] reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].)  However, to the extent that the findings concerning mother's use of substances may affect her in these proceedings (such as in crafting appropriate dispositional orders), or other proceedings, we may exercise our discretion to reach the merits of her arguments.  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762.)  Here, the trial court ordered mother to undergo drug testing, therefore we will reach the merits of the challenge to jurisdiction under subdivision (b).

14

Mother and the children contend the sustained allegation of mother's single drug conviction is insufficient to support jurisdiction under section 300, subdivision (b), as the petition did not allege (and the evidence did not support a finding) that mother had a past or current substance abuse problem, and the Department did not establish a substantial risk of physical harm to the children based on mother's conduct. They contend that a "single incident of parental misconduct is [in]sufficient to bring the minor within the juvenile court's jurisdiction." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023-1024, 1026 [finding that single drinking and driving incident was insufficient to support jurisdiction where there was no evidence showing that such behavior would recur in the future, and no evidence of domestic violence or other problems in the home]; see also *In re David M.* (2005) 134 Cal.App.4th 822, 829 [speculative risk of harm is insufficient to support jurisdiction].) We are not persuaded.

First, mother and the children have read the sustained allegation too narrowly. The sustained allegation is that "[o]n 3-14, the mother pled guilty to 11377(a) of the Penal Code and was placed on a deferred entry of judgment. . . [¶] . . . Her guilty plea was based on finding drug paraphernalia, pipes, containing methamphetamine in mother's car. . . . Said conduct on the part of the mother endangers the children's physical and emotional health and safety and places the children at risk of physical, emotional harm or damage."[5] It is not the singular fact of mother's conviction, but her possession of drugs while driving, coupled with the legal consequences of her drug possession, which forms the basis of the sustained allegation.

Under section 300, subdivision (b), the juvenile court may adjudge a child to be a dependant of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." There must be evidence of "(1) neglectful conduct by the parent in one of the specified forms;

_____

[5] Mother appears to contend that the sustained allegation was that her drug conviction placed the children only at risk for emotional harm, and that emotional harm, alone, is an insufficient basis for jurisdiction. However, the amended petition clearly alleges risk of physical harm.

15

(2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

The record here supports the drug possession basis for the dependency court's jurisdiction over these children. Mother pled guilty to the drug charges, creating a legal presumption that she possessed methamphetamine. Moreover, her arrest and conviction occurred while these proceedings were pending, when mother was aware that she needed to be on her best behavior in order to have her children returned to her. Although mother testified that she no longer associated with her drug using friends, the trial court found mother's credibility was questionable, based on her history of making false statements to the Department and law enforcement. Moreover, mother missed a drug test and tested positive for alcohol, demonstrating that she was not taking these proceedings seriously. Therefore, the evidence amply supported a finding that mother's conduct put the children at risk of serious physical harm.

This case is distinguishable from those relied on by mother and children, where there was no evidence that a parent's use of substances or mental health problems had a negative impact on the children, and there were no other factors creating safety concerns for the children. (See *In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 768-769; *In re J.N.*, *supra*, 181 Cal.App.4th at pp. 1023-1024; *In re David M.*, *supra*, 134 Cal.App.4th at p. 830; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1345-1346.)

### 2. Dispositional Orders

Mother challenges the order removing the children from her custody. However, during the pendency of this appeal, the trial court released the children to her. We agree with respondent that this issue is now moot, because mother has already received the relief sought in this appeal. An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief. (*In re Albert G.* (2003) 113 Cal.App.4th 132, 134-135; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1317; *In re Pablo D.* (1998) 67 Cal.App.4th 759, 761; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 769; *In re Katherine R.* (1970) 6 Cal.App.3d 354, 357.)

16

Mother asks us to reach the merits of her challenge to the removal order, although she has failed to identify any collateral consequences or prejudice she may experience if we do not. Even if we were to reach the merits of mother's challenge, we would affirm the removal order, based on the significant domestic violence to which the children were exposed, mother's repeated recanting of the violence, and the fact that she had only recently started to understand the impact the violence had on the children or taken steps to prevent it. (§ 361, subd. (c)(1); see *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

As to the disposition order requiring mother to drug test, we must affirm because, as discussed above, mother's drug use created legitimate safety concerns for the children. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 ["The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion."].)

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.


GRIMES, J.

We concur:

BIGELOW, P. J.


RUBIN, J.


17